IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LISA WHALEN | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No. 15-2200 |
| STATE FARM FIRE AND CASUALTY COMPANY | : | |
| Defendant. | : | |

# MEMORANDUM

**PADOVA, J.**                                                                                    **APRIL   , 2016**

      Plaintiff, Lisa Whalen, filed this action against Defendant State Farm Fire and Casualty Company ("State Farm") in state court alleging breach of a homeowner's insurance policy and a claim for bad faith. The action was removed to this Court by State Farm on April 24, 2015. Presently before the Court is State Farm's Motion for partial summary judgment on the bad faith claim. For the following reasons, the Motion is granted.

## I.    LEGAL STANDARD

      Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. In ruling on a summary judgment motion, we "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 276 (3d Cir. 2001) (internal quotation marks omitted). If a

reasonable fact finder could find in the nonmovant's favor, summary judgment may not be granted.  Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 130 (3d Cir. 2002).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).  Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

"'While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.'"  Galli v. N.J. Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007) (quoting Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005)).  "Evidence that is merely colorable or not significantly probative is insufficient to create a genuine issue of material fact for trial."  West v. Lincoln Benefit Life Co., 509 F.3d 160, 172 (3d Cir. 2007) (citing Anderson, 477 U.S. at 248, and El v. Se. Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007)).

**II.     SUMMARY JUDGMENT RECORD**

State Farm has filed a Concise Statement of Stipulated Material Facts and a Concise Statement of Additional Facts that are contested by Plaintiff. (See ECF 22.[1]) It is undisputed that Lisa Whalen is the owner of a home located at 33 Hillside Avenue in Doylestown, Bucks County, Pennsylvania. On January 18, 2014, Whalen's home sustained water damage as the result of a failed supply line pipe to an upstairs sink. On the date of the loss, Whalen's home was insured under a policy of homeowners insurance with State Farm. The insurance provided coverage for the loss under certain terms as defined by the policy. (See Compl. Ex. B; Answer Ex. C.)

When the water loss was discovered in the insured home, Whalen was away on a cruise and the water had been running for an unknown period of time. (Def. Ex. D at SF052.) The damage was reported to State Farm by Whalen's neighbor who had discovered the loss. (Id. at SF053.) State Farm's claim representative spoke to the neighbor the next morning and was told that ServPro, a mitigation specialist, was at the home to remediate the damage. (Id.) Whalen returned to her home on January 19, 2014, and spoke to State Farm about her loss on January 20. (Id. at SF052.) Also on January 20, ServPro's representative reported to State Farm on the extent of the loss and the drying process in place for the home, stating that contents, floors, ceilings, and walls were damaged. (Id.)

State Farm has produced evidence that the claim was moved to its Large Loss unit for further handling at that time. (Id. ("Revd. claim with TM [team manager] M. Ovalle confirmed loss meets LL [Large Loss] criteria moving claim to LL to HTC [handle to conclusion]"); see also Def. Reply Br. Ex. B. (Aff. of John L. McDonnell) at ¶ 4 (identifying himself as a member

---

[1] Plaintiff did not paginate her Brief and other materials. We cite to them by the pagination added by the Court's ECF system.

of State Farm's Large Loss unit).)  State Farm Large Loss representative John McDonnell met the insured and a ServPro representative at Whalen's home on January 21, 2014 for an inspection.  (Def. Ex. D at SF05l; Def. Reply Br. Ex. B.)  Mike Zazula inspected the home at State Farm's request.  He reported that a cold water supply line to the sink in a bathroom had frozen, causing a pipe to burst, resulting in the water damage.  He also confirmed that heat had been maintained in the home using a programmable thermostat.  (Id. at SF050.)  The home was also inspected by Dan Guyer from State Farm's Large Loss unit on January 29, 2014.  (Id.; Def. Reply Br. Ex. C (Aff. of Charles Curley) at ¶ 4 (identifying Guyer as a member of the Large Loss unit).)  He confirmed the extent of the damage, the condition of the home prior to the loss, and the status of the mitigation efforts.  (Id.)  Whalen disputes whether the claim was actually assigned to the Large Loss unit.  As support, she cites to a letter written by her Public Adjuster ("PA"), James Wagner of Alliance Adjustment Group on October 25, 2014, requesting that State Farm "retain the services of a large loss building consultant."  (See Pl. Ex. A.)

Mr. Guyer inspected the home again on February 28, after he was told by ServPro that the house was dry and most of the debris and dust had been removed.  (Id. at SF047.)  On March 12, 2014, Mr. Guyer received the ServPro estimate for remediation of the structure and contents, which totaled $35,868.50.  (Def. Ex. D at SF046; Def. Ex. E.)  Mr. Guyer prepared a repair estimate for the dwelling loss and emailed it to the Plaintiff.  The total amount of the loss was stated as $110,891.25, less depreciation of $15,924.93, less the policy deductible of $1,000, and less the payment to ServPro of $35,868.50, resulting in an actual cash value ("ACV") payment on the claim of $69,129.70.  (Def. Ex. D at SF044-046; Def. Ex. F.)

Mr. Guyer requested authority in this amount on March 18, 2014, which was to be added to the amount disbursed for dry-cleaning services and advances to the insured for alternative

4

living expenses through July 16, 2014, for a total authority request of $151,052.27. The authority was granted on March 19, 2014. (Def. Ex. E at SF043-044.) Drafts in the amount of $69,129.70 (Dwelling ACV), $24,836.62 (ServPro mitigation) and $11,031.88 (ServPro pack out) were sent to Whalen on March 26, 2014. (Id. at SF043; Def. Ex. G (letter enclosing payment).)

On April 11, 2014, Guyer received a proposal in the amount of $139,850.00 from Whalen's contractor, JR Maxwell Builders. (Def. Ex. E at SF043.) However, this proposal included work that was not covered as a loss under the policy, such as work to remodel the kitchen, add a laundry room, and replace the existing oil furnace with a gas-fired HVAC system and gas water heater. (Id. at SF042; Def. Ex. H ("Maxwell Estimate").)

On April 3, 2014, Whalen hired Alliance to act as her PA, and Wagner notified State Farm that she was now being represented by that company for her water loss. (Id. at SF 041-042.) Mr. Guyer arranged for another inspection at the loss location on April 11, 2014 with Wagner. Guyer was presented with an Alliance estimate for dwelling repairs in the amount of $362,583.45. (Id. at SF041.) This estimate covered knocking down all interior walls; replacing the hardwood floors, as well as the associated doors, frames and bracing; installing new electric, plumbing, insulation, and exterior aluminum siding; replacing windows; and engineering and architect fees. (Id. at SF041.) On April 11, 2014, Wagner and Guyer discussed various repairs; State Farm asserts that they agreed that the existing pine floors could be covered by another layer of pine to address damage caused by the water incursion (see id. at SF041), but Wagner denied ever making such an agreement. (See Pl. Ex. B (Unsworn Aff. of James Wagner) at ¶ 7.) As a result of his April 11, 2014 inspection, Mr. Guyer revised the State Farm estimate. After

receiving the necessary authority from his Team Manager, a check was issued on May 6, 2014. (See Def. Ex. D at SF038; Def. Ex. I.)

State Farm received a "blacked-out" version of the PA's estimate on May 21, 2014; it was reviewed by Dan Guyer on May 27, 2014. This estimate was in the amount of $375,082.91. (Def. Ex. J.) The estimate was not revised to reflect any change from "replacement of flooring" to "repair the wood floors by installing pine on top of the existing flooring." Numerous other additions were also made. (Id.)

During the handling of the claim, State Farm wrote to Whalen and her PA on May 6, May 16, June 12, June 26, July 2 and July 25, 2014, addressing contents and building issues. (Def. Ex. K.) Since State Farm and the PA still disagreed as to the scope of the covered loss, another inspection of the home took place on July 31, 2014. The parties were able to agree on some but not all of the scope decisions. (Def. Ex. D at SF033-34.) Guyer revised his estimate and requested additional authority for $241,084.84, under the Dwelling coverage for removal and replacement of the floors and walls, code upgrades, and architectural and other fees. (Id. at SF032-33; Def. Ex. M.) The authority was granted and the draft for the additional ACV payment was issued on August 13, 2014. (Def. Ex. D at SF03l; Def. Ex. K (Letter of August 13, 2014).)

Throughout the course of the claims handling, the PA wrote to ask that State Farm revise its estimates. Because the differences between the State Farm and the PA's estimates were unlikely to be resolved, State Farm requested "appraisal" under the terms of the Policy on October 23, 2014, and named its appraiser. (Def. Ex. D at SF027-28; Ex. N; Ex. B at 14.[2])

---

[2] While Whalen "specifically denie[s] that Defendant properly requested appraisal per the terms and conditions of the policy," see Pl. Concise Statement at ¶ 32, Wagner avers that "State Farm requested appraisal on October 23, 2014." (Pl. Ex. B at ¶ 17.)

Whalen did not agree to the appraisal request, and the PA requested another inspection; because there had already been four inspections, State Farm declined and advised Plaintiff to choose her appraiser promptly in accordance with the terms of the policy. (Def. Ex. O.[3]) Plaintiff did not select an appraiser before filing suit.

Plaintiff was required to submit an inventory of her personal property in order for State Farm to evaluate and pay her claim under the household contents coverage of the policy. (Def. Ex. B at 13 ("Your Duties After Loss").) Although multiple reminders were given to both Ms. Whalen and her PA, the inventory was not provided until September 9, 2014. (Def. Ex. K (letters requesting contents inventory and plaintiff's personal inventory); Ex. P (Sept. 9, 2014 inventory).) Although Whalen denies "that Plaintiff was required to create a personal property inventory," she has produced no record evidence to substantiate that assertion, and did, in fact, provide the inventory.

The September 9, 2014 inventory listed 171 items, but certain items were noted as "open" because certain information was missing, such as the age of the item. On December 4, 2014, the PA advised State Farm that he was working with Plaintiff to provide the additional information. (Def. Ex. D at SF029, SF025.) The PA provided a supplemental contents list, which was received on December 5, 2014. (Def. Ex. Q.) The revised inventory of 171 items was reviewed and State Farm applied a depreciation deduction[4] to the items that had not yet been replaced.

---

[3] While Whalen denies that her PA requested another inspection, and that State Farm advised her to choose an appraiser, her PA avers that he did request another inspection and that Plaintiff rejected appraisal under the Policy because it was not a proper method of resolving the dispute. (Pl. Ex. B. at ¶¶ 19, 20, 21.)

[4] The Policy provides that "We will pay the cost to repair or replace property covered . . . subject to the following: (1) until repair or replacement is completed, we will pay only the cost to repair or replace less depreciation; (2) after repair or replacement is completed, we will pay the difference between the cost to repair or replace less depreciation and the costs you have actually and necessarily spent to repair or replace the property; and (3) if property is not repaired

(Def. Ex. B at 12; Ex. D at SF029; Ex. R (State Farm personal property estimate).[5]) Based on State Farm's investigation, certain items were researched for pricing and State Farm identified on its estimate the business from which it derived the pricing. Some items were determined to be building items and covered under the Building coverage of the policy (therefore reflecting $0 ACV on the estimate). (Def. Ex. S.) The total replacement cost value on the covered contents was determined to be $55,445.32, less depreciation of $16,200.34, which would be reimbursed if and when the covered items were replaced. A net ACV payment of $32,044.98 was paid. (Def. Ex. R.) State Farm declined to pay the PA's acquisition charge of $13,073.70, as it is not covered by the policy. (See Def. Ex. B at 12, (B-1 - Limited Replacement Cost Settlement); Ex. R.) Although Whalen asserts that the charge was covered by the policy, she has submitted no record evidence to that effect.

In Count II of Whalen's Complaint, she alleges that State Farm acted in bad faith in three ways: (1) by denying portions of her claim without basis, without conducting a reasonable investigation or explaining its coverage decisions, and denying her the opportunity to rebut its positions and/or provide additional documents or information that would have tended to support her positions; (2) by using an improper method of calculating depreciation on non-replaced

---

or replaced within two years after the date of loss, we will pay only the costs to repair or replace less depreciation." (Def. Ex. B at 12.)

[5] Whalen "specifically denies that depreciation was taken pursuant to the terms and conditions of the policy," and contends that "depreciation is supposed to be based on the age, condition and obsolescence of the items damages" but State Farm "took straight line depreciation and its "manner in taking depreciation does not take the condition of the item into consideration." (Pl. Concise Statement at ¶ 38 (citing Pl's. Ex. C (State Farm Depreciation Spreadsheet)).) Exhibit C records the depreciation percentage applied to each item; it does not establish that those percentages were not in accordance with the Policy's provisions. Notably, Whalen provides no record evidence that she complained to State Farm that the method of depreciation was improper before starting suit.

household contents, thereby underpaying their ACV; and (3) by failing to assign a large loss adjuster to her claim. (Compl. ¶ 45.)

## III. BAD FAITH

In Pennsylvania, a claim for insurer bad faith is provided by statute. See 42 Pa. Cons. Stat. § 8371 (permitting the award of interest, punitive damages and attorney fees against an insurer that has acted in bad faith). However, the statute does not define the term "bad faith." The courts have held that to recover under the bad faith statute, a plaintiff must show, by clear and convincing evidence: "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis." Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997) (citing Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (specifying clear and convincing standard)). Merely negligent conduct, however harmful to the interests of the insured, is recognized by Pennsylvania courts to be categorically below the threshold required for a showing of bad faith. Brown v. Progressive Ins. Co., 860 A.2d 493, 501 (Pa. Super. Ct. 2004). "Bad faith claims are fact specific and depend on the conduct of the insurer vis-a-vis the insured." Condio v. Erie Ins. Exch., 899 A.2d 1136, 1143 (Pa. Super. Ct. 2006) (quoting Williams v. Nationwide Mut. Ins. Co., 750 A.2d 881, 887 (Pa. Super. Ct. 2000)).

Actionable bad faith can encompass behavior beyond the denial of a claim without a reasonable basis, including an insurer's investigation of a claim. Hollock v. Erie Ins. Exch., 842 A.2d 409, 415 (Pa. Super. Ct. 2004) (en banc) ("[T]he broad language of section 8371 was designed to remedy all instances of bad faith conduct by an insurer. . . . Therefore, . . . [a]n action for bad faith may also extend to the insurer's investigative practices. . . .") (second alteration in original; internal quotations omitted)); see also Bombar v. W. Am. Ins. Co., 932

A.2d 78, 92 (Pa. Super. Ct. 2007) ("Implicit in Hollock's holdings is the requirement that the insurer properly investigate claims prior to refusing to pay the proceeds of the policy to its insured.") (citing Condio, 899 A.2d at 1142-44).

In the summary judgment context, a plaintiff's burden in opposing a dispositive motion on a bad faith claim "is commensurately high in light of the substantive evidentiary burden at trial." J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 367 (3d Cir. 2004). Summary judgment is "appropriate where there is no clear and convincing evidence that the insurer's conduct was unreasonable and that it knew or recklessly disregarded its lack of a reasonable basis in denying the claim." Bostick v. ITT Hartford Grp., Inc., 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999) (citing Jung v. Nationwide Mut. Fire Ins. Co., 949 F. Supp. 353 (E.D. Pa. 1997) and Leo v. State Farm Mut. Auto. Ins. Co., 939 F. Supp. 1186, 1192-93 (E.D. Pa. 1996)).

    a.    Failure to provide information, conduct a reasonable investigation, and explain coverage decisions.

The first claim of bad faith is based upon Whalen's assertion that State Farm failed to provide her with information on its claims decisions. State Farm argues it did not act in bad faith in the handling of Whalen's claim because the summary judgment record shows it acted promptly, investigated the claim to the extent possible, and kept the insured advised during the claims process. While Plaintiff's Complaint asserts that State Farm was unresponsive to her PA's correspondence, Defendant argues that the summary judgment record shows that it did appropriately respond, although not in the manner dictated by each of the PA's demands. Finally, it argues that, although the parties differed on the extent of the damage related to the loss, that disagreement is not grounds for a claim of bad faith since State Farm's position on the claim was not frivolous or unfounded, adopted with a dishonest purpose, or motivated by self-

interest or ill will.  In sum, it argues that there is no evidence, much less clear and convincing evidence, to suggest that it acted in a frivolous manner or in bad faith.

Whalen responds that it is undisputed that Wagner sent a series of letters asking specific questions and requested specific information as to why State Farm was refusing to include certain repair components it its estimate.  (Pl's. Mem in Opp. to Def's. Mot. for Partial Sum. Judg., ECF 23 at 20-21.)  She asserts that Defendant's characterization of these letters as a request to respond to the PA's estimates is false.  Rather, she contends, PA Wagner wanted to know the basis for State Farm's coverage decisions, and Defendant never provided that information, constituting bad faith.  Whalen contends that, to the extent that Defendant's Motion can be read to allege that it provided this information, this is a material fact in dispute precluding summary judgment, as the failure to properly respond to these letters may be evidence of bad faith.  (Id. at 21.)  She argues that where an insurance company fails to provide an explanation of its coverage decisions in order to permit the insured to rebut the decision, this too constitutes bad faith.  (Id. at 23.)  She contends that State Farm "refused to advise Plaintiff and/or her representative, of the reasons why it omitted a large number of repair components, which [PA] Wagner believes are necessary to restore Plaintiff's property to its pre-loss condition.  This denied Plaintiff the ability to provide information that would tend to rebut Defendant's coverage decision."  (Id.)

The summary judgment record includes letters from PA Wagner dated May 15, 2014, June 18, 2014, June 24, 2014, July 8, 2014, September 11, 2014, and October 25, 2014.  (Id. at 71-76, 30.)  In the May 15 letter, acknowledging receipt of State Farm's estimate of the claim, Wagner asserts that the insurer "failed to include a large percentage of the items or areas that we have claimed in our estimate."  (Id. at 71.)  Wagner asks for a "specific written explanation as to

why you are not including it." (Id.)  John McDonnell of State Farm responded to Wagner on June 12, 2014, stating "[w]e have released the undisputed amount for the actual cash value for the building.  At this time, we are reviewing your estimate and we will get back to you in the near future." (Def. Ex. K at SF645.)  In response to the June 12 letter, Wagner wrote on June 18, "Just to be clear, we are currently awaiting a revised building estimate from you, based on the itemized revised estimate request we sent you on May 15, 2014. . . .  I was hoping that we would have received same by now.  Any effort you can make to expedite the revised estimate would be greatly appreciated." (ECF 23 at 72.)

On June 24, Wagner sent to State Farm "my revised estimate to reflect the vanity in the bathroom that was custom made from a dresser.  I realize that we remain far apart with regard to our respective positions, but I request that you make a supplemental payment with regard to the vanity. . . .  In the meantime, it is my understanding that [the architect's estimate] will be a minimum of $3,000.00.  I request that you provide payment of $3,000.00 for the architect pending the delivery of the actual estimate or invoice." (Id. at 73.)  McDonnell responded to the June 24 letter on July 2, 2014, stating,

> In your correspondence you request that we issue a supplement for the vanity.  At this time I would like to refer you to our building estimate specifically line items 345 and 359.  These items represent the replacement of the vanity and also to refinish the fronts.  I would also like to address your request for us to issue a payment for the architect.  We will certainly pay any architect fees that are incurred by the insured to restore the building to its pre-loss condition.  I would also like to add any changes that the insured makes that requires time from an architect to draw up plans, will be not covered under this loss.  Once we receive a copy of the architect's fees and drawings, we will review and issue a draft based on the above-mentioned pre-loss condition of the home.  We will also consider any code issues.

(Def. Ex. K at SF638.)

State Farm's McDonnell responded to Wagner's June 18 letter on June 26, "Please see our settlement estimate in our letter dated May 6, 2014.  This outline is a fair and accurate scope of the covered repairs associated with the above-captioned claim. . . ."  (Id. at SF641.) McDonnell, after citing applicable policy language, went on to state in the June 26 letter that "[t]hose items that you have indicated are in question represent items that are not needed in the repair of covered damages.  Please provide us with specific information and documentation in support of any items you indicate are in question."  (Id. at SF642.)  In a separate letter, also dated June 26, discussing a claim about a rug, McDonnell stated "I would also like to add that we are still waiting for you to submit the personal property inventory."  (Id. at SF639.)  Wagner responded to the letters on July 8, stating,

> I ask you to specifically identify each item contained in my estimate which you have deemed to be not necessary.  Further, I ask you to state the basis for your opinion that your estimate is fair and accurate.  Obviously, I do not agree with your opinion, as documented by my estimate.  Frankly, your estimate provides for nothing more than placing a band aid on the damages.  Please stop sending me boiler plate letters which do not address the real issues in this claim.

(ECF 23 at 74.)  McDonnell responded in writing on July 25 stating, "As per your request, I called you on July 17, 2014.  Mr. Feinstein, your associate, called me back and advised that he would talk to you about setting up a meeting to review the building damages.  Please contact me to set an appointment.  I would also like to add that we have not received your assessment of the contents."  (Def. Ex. K at SF635.)

As noted earlier, State Farm issued a revised estimate of the loss on August 14, 2014, and requested additional authority for $241,084.84, under the Dwelling and Building coverage for removal and replacement of the floors and walls, code upgrades, and architectural and other fees. (Def. Ex. M.)  McDonnell issued a further payment of $35,286.86, representing "the additional amount owed for the actual cash value of the loss" and added, "Please be advised that we are still

13

waiting to hear from you with respect to the contents portion of the claim." (Def. Ex. K at SF659.) Wagner, in a letter dated September 11, 2014, acknowledged receipt of the revised estimate, but stated,

> Although you provided us with your revised estimate, you did not include all of the necessary repairs nor did you provide any explanation for your decision to continue to omit certain repairs from your estimate. It was my expectation that you would revise your estimate to include ALL of the missing repair components unless you could provide a rational explanation for any exclusions. I never expected to receive what you sent me, which was a revised estimate that did not fully indemnify your insured(s) for the loss without a reasonable basis for the shortages.

(ECF 23 at 75.) Wagner enclosed another "blacked out" estimate showing those items still not accounted for by State Farm, and asked that McDonnell "review this document and send me a second revised estimate which includes all of the repairs that have been omitted from your revised estimate, or to provide me with a detailed explanation for why continue [sic] to refuse to pay for certain items." (Id.)

On October 23, 2014, State Farm's Glenn Stockmal responded to Wagner stating that "Considering that it has now been 9 months since this loss, in lieu of sending letters back and forth, I would like to move this claim toward conclusion. While we appreciate your recent offer to split the difference, we must respectfully decline. Instead, I would suggest Appraisal at this point to settle our difference, as per the policy Conditions." (Def. Ex. N.) Wagner responded on October 25, 2014, asking State Farm to "retain the services of a large loss building consultant to meet with me at the property in an effort to resolve the items that remain in dispute." (ECF 23 at 30.) State Farm sent two additional letters in response to letters from Wagner that Plaintiff has not included in her summary judgment exhibits. On November 17, 2014, Stockmal stated, "Responding to your November 1, 2014 letter, we respectfully decline your request for another meeting at the house." (Def. Ex. O at SF461.) He notes that the house has been inspected four

times and that State Farm wished to proceed with Appraisal. Id.  Finally, on December 18, Stockmal wrote in response to a Wagner letter dated December 5, 2014, that it was rejecting Wagner's suggestion that the claim be resolved outside the Appraisal process and once again demanded appraisal based on the policy conditions. (Id. at SF651.)

We find that this record does not establish clear and convincing evidence of bad faith on a failure to provide information/conduct a reasonable investigation/explain coverage decisions theory.  First, the record demonstrates that State Farm did respond to the PA's letters.  Second, while Wagner was dissatisfied with the information he received because, according to Plaintiff, State Farm failed to offer a reason why the unpaid portions of the claimed losses were denied, this argument is not supported by clear and convincing evidence in the record.  State Farm did offer reasons for its failure to pay portions of the claimed losses.  Specifically in the June 26 letter, McDonnell cited the applicable policy language and informed Wagner that "[t]hose items that you have indicated are in question represent items that are not needed in the repair of covered damages.  Please provide us with specific information and documentation in support of any items you indicate are in question." (Def. Ex. K at SF642.)  The only thing in the record to demonstrate that Plaintiff responded to this request is Wagner's second "blacked out" estimate allegedly showing the remaining unpaid items.  There is no suggestion, however, that Wagner presented State Farm with documentation to support his claim that the items on his list were covered items.  In sum, Whalen has failed to meet her summary judgment burden of coming forward with clear and convincing evidence that the manner in which State Farm responded to her requests for information were deceptive or that it tried to hide information.

b.   Use of an improper method of calculating depreciation.

In Paragraphs 49f-g of the Complaint, Whalen alleges that State Farm acted in bad faith by using an improper method of calculating depreciation, i.e., straight line depreciation, for the damage to her household contents and thereby underpaid the actual cash value of the contents.

Deducting for depreciation is permitted by the Policy, which states

> We will pay the cost to repair or replace property covered . . . subject to the following:  (1) until repair or replacement is completed, we will pay only the cost to repair or replace less depreciation; (2) after repair or replacement is completed, we will pay the difference between the cost to repair or replace less depreciation and the cost you have actually and necessarily spent to repair or replace the property; and (3) if property is not repaired or replaced within two years after the date of loss, we will pay only the cost to repair or replace less depreciation.

(Def. Ex. B at 12.)  Thus, the issue of depreciation arises only where the lost property is not replaced.

Courts have held that depreciation, in the insurance context, "is properly defined as physical deterioration." Dickler v. CIGNA Prop. & Cas. Co., 957 F.2d 1088, 1098-99 (3d Cir. 1992) (applying New York law) (citing Depreciation as Factor in Determining Actual Cash Value for Partial Loss under Insurance Policy, 8 A.L.R. 4th 534, 535 n. 2 (1981) ("The type of depreciation considered under insurance law is that which purports to measure the deterioration of property by reason of age and physical wear and tear"); and Note, Valuation and Measure of Recovery Under Fire Insurance Policies, 49 Colum. L. Rev. 818, 823 (1949) ("Insurance law is not concerned with the estimated depreciation charged off on the books of business establishments, but rather with the actual deterioration of a structure by reason of age and physical wear and tear, computed as of the time of loss.")).  The Third Circuit stated that "[a]dmittedly, physical deterioration is not the only possible definition of depreciation." Dickler at 1099 (citing Insuring Real Property, § 24.03(3) at 24-21 ("Where the cost to repair or replace

less depreciation standard is used, [a dispute exists over] whether the term depreciation implies only physical depreciation or includes a broader concept including obsolescence and economic and functional depreciation." (alteration in original))). Nevertheless, the Court held that "depreciation in this case should be defined as physical deterioration pursuant to the well-established principle that ambiguities in an insurance contract must be construed in favor of the insured." Id. (citing Anchor Toy Corp. v. Am. Eagle Fire Ins. Co., 201 N.Y.S.2d 722, 724 (1960)).

As noted earlier, Whalen has specifically denied State Farm's factual averment that "depreciation was taken pursuant to the terms and conditions of the policy," contending instead that "depreciation is supposed to be based on the age, condition and obsolescence of the items damages," but State Farm "took straight line depreciation," meaning its "manner in taking depreciation does not take the condition of the item into consideration."  (Pl. Concise Statement at ¶ 38 (citing Pl. Ex. C (State Farm Depreciation Spreadsheet))._)  Importantly, she provides no record evidence that she complained to State Farm that the method of depreciation it used was improper before starting suit.  The only evidence she has presented to meet her summary judgment burden to produce clear and convincing evidence of bad faith due to improper depreciation charges is Wagner's unsworn affidavit — prepared after suit was started — in which he avers that

> it is my opinion that State Farm took excessive depreciation on Plaintiff's claim for damages to her contents. . . .  The pre-loss condition of the property is always a factor to be used when calculating depreciation. . . .  State Farm's method of calculating depreciation does not account for the pre-loss condition of the damaged personal property. . . .  Based on my adjustment of this claim, Plaintiff's personal property was in excellent condition prior to the loss.

(ECF 23 at 34-35 (internal paragraph numbers omitted).)

We find that, to survive summary judgment on this aspect of her bad faith claim, it is not sufficient for Whalen to assert that she and her insurer had a disagreement over the claim; Whalen's burden is to show by clear and convincing evidence that State Farm's decision to use the straight line method of calculating depreciation was unreasonable and that it knew or recklessly disregarded its lack of a reasonable basis when determining the depreciation method to use.  See Bostick, 56 F. Supp. 2d at 587.  She has failed to do so.  Since depreciation is the measure of the deterioration of property by reason of age and physical wear and tear, and State Farm's spreadsheet recorded the age/useful life and condition of each item to justify its depreciation percentage, it had a reasonable basis for its depreciation deduction.  At best, Whalen has shown only that she disagrees with State Farm's choice.  She has not produced clear and convincing evidence that she raised the issue of State Farm's straight line depreciation method prior to starting suit, that State Farm knew the method was improper and chose to use it anyway, or that it did so with ill will or with an improper motive.

      c.      Failure to assign a large loss adjuster to her claim.

Finally, PA Wagner asserts in his unsworn affidavit that on October 25, 2014, he requested that Whalen's claim be assigned to a large loss adjuster; that State Farm denied his request; and that he is "personally familiar with John McDonnell, he is not a large loss adjuster or supervisor."  (Pl. Ex. B, ECF 23 at 34, ¶¶ 23-25.)  This is the only evidence Whalen has produced to meet her summary judgment burden to show clear and convincing evidence of bad faith on the theory that State Farm failed to assign a large loss adjuster to her claim.  We find that this does not constitute clear and convincing evidence of bad faith.  First, McDonnell himself asserts that he is a large loss claims representative, and was assigned to the Whalen loss on January 20, 2014.  (Def. Reply Ex. B (Nov. 2, 2015 Aff. of John L. McDonnell).)  More

importantly, it is not clear and convincing evidence that State Farm lacked a reasonable basis for denying a benefit and knew or recklessly disregarded its lack of reasonable basis. At best, the disputed assertion that State Farm failed to assign the proper type of adjuster shows only negligent conduct since Whalen has not shown that the assignment of McDonnell was improper and State Farm chose to do it anyway, or that it assigned McDonnell with ill will or with an improper motive.

### IV. CONCLUSION

Count II of Whalen's Complaint, asserting a claim for bad faith against State Farm is subject to summary judgment since Plaintiff has not produced clear and convincing evidence that State Farm lacked a reasonable basis for denying a benefit and knew or recklessly disregarded its lack of reasonable basis. Accordingly, Defendant's Motion for Partial Summary Judgment is granted. An appropriate order follows.

BY THE COURT:


 /s/ John R. Padova
John R. Padova, J.